Dayis, J.,
delivered the opinion of the court:
This case, with others like it, was fully argued at the last term, and after careful study and industrious conference an opinion was delivered upon the general principles applicable to the claims as a class, while final and detailed findings were delayed, at the defendants’ request, until after the summer recess. During this recess the law officers of the Government, diligently and jealously guarding the interests intrusted to them, have carefully studied not only the facts of the several cases, but have re-examined the general principles applicable to the claims as a class — principles understood to have been finally settled, so far as this court is concerned, by the former decisions.
The defendants now move for a rehearing, and somewhat contrary to the usual practice, but in furtherance of the substantial ends of justice, a full, able, and learned argument, occupying nearly two weeks, has been had, in which all the questions heretofore considered have again been exhaustively discussed. Thus, upon a motion for permission to reargue the case, it has in fact been reargued, and in deciding the motion we act with all the light we should have received had the more technical course been pursued of first allowing the motion and then hearing-the reargument.
The learned Solicitor-General, who has personally appeared with the assistant attorney of the United States who so competently conducted the defense of these claims, takes as the text of his argument certain suggested conclusions of law, twenty-five in number, many of which may be readily admitted, either standing alone or in the connection in which they are used, without leading to a result different from that already reached by this court; while considered as a whole they form the successive links of a chain of argument which, if perfect, defeats all the claims submitted under the act of Congress.
Many of the difficulties surrounding these cases will disappear under the touchstone of the jurisdictional act, for it must always be remembered that we are not now to decide in accordance with the general statutes giving us exclusive jurisdiction of actions between the citizen and his Government founded ®n contract, nor yet under the special jurisdiction conferred by such laws as the “ Bowman Act,” by which, in aid of Congress, *29 we report facts to that body or its committees, and facts and law to the Executive Departments for their “ guidance and action”; nor under the jurisdiction given by section 1063 of the Revised Statutes, which authorizes us'to proceed to final judgment in claims of a certain nature transmitted to us by the heads of the principal Executive Departments. In all these cases we sit as a court bound to administer the law found in the Constitution, statutes, and common law of the United States as interpreted by the Supreme Court, and, so far as we have yet seen, not one of the spoliation claims could have the slightest pretense of a successful result were the investigation to be measured by the standard set for us in other causes. It cannot be presumed that Congress, in passing the act of 1885, with full knowledge of the law and facts, intended an empty form; therefore it follows that they desired us not only to examine these claims, but to examine them in the light of some rule different from that upon which we must ordinarily proceed.
The statute says that those citizens or their legal representatives who had “valid claims” of a specified class upon the French Government, arising out of certain illegal acts committed prior to the ratification of the treaty of 1800, may apply to this court (§ 1); we are then to determine the validity and amount of these claims “ according to the rules of law, municipal and international, and the treaties of the United States applicable to the same,” but we cannot enter judgment; on the contrary, after the hearing we may only report to the Congress such conclusions of fact and law as in our opinion may affect the liability of the United States for these claims (§§ 3 and 6), and this report is binding on neither the claimant nor the Congress (§6).
The first question presented, then, is as to the validity of the claims against France. This is an international question not within the scope of ordinary judicial inquiry, and is to be measured by rules of law well known, thoroughly recognized, and often enforced, but which in the very nature of things are not, in the absence of special legislative authority, presented to, argued before, or passed upon by the judicial departments of Governments. These rules of law relate to the rights and obligations of nations, not to the title to property, nor to the rights of individuals between themselves, nor yet to the rights of individuals against their own Governments.
*30 While many of the propositions of the defense are in the abstract sound, they rest upon the basis that these claimants are prosecuting a legal right in a court of law acting under the usual common-law restrictions of such a tribunal sitting as a subordinate agent of the state with strictly defined procedure and jurisdiction. So far as power is concerned this court is not so sitting in these cases; “judicial power is the internal or civil branch of executive power exerting itself under such checks and controls as the legislative power has subjected it to” (11 Rutherforth, 59); those checks and controls are well defined and well understood, and are such as operate to defeat in judicial tribunals diplomatic claims founded upon international right.
We are for the present, to a limited degree, absolved by express act of the legislature from these checks and controls.
That is, we are to aid the political department of the Government, by its direction, in the disposal of contentions which arise from past international transactions, and while the claims of individuals now before us are not, from a judicial point of view, legal rights — that is, they do not constitute causes of action — they may be none the less rights; that is, they may be founded on law but not enforceable in a court of law.
We do not intend to assume any legislative function or to determine any abstract right, for our power is fixed and defined by the act of Congress, which authorizes no such course, but which does require something more than a bare opinion that there can be no recovery on these claims in the courts; that was known before the statute was passed, and the legislature have instructed us by that statute to advise them not as to the law enforceable in courts of law, not as to abstract rights, but as to the law enforceable within their own higher jurisdiction.
We have already held that the depredations made by France upon our commerce were illegal, and notwithstanding the able argument of the defense, sustained by the results of most industrious investigation, we do not see reason for changing this conclusion. The quotations in our previous opinion show that the Government of the United States uniformly insisted upon the illegality of the conduct of France and never failed to demand redress; they show that France admitted the principle of the American contention; that Spain paid claims of this *31 class ; that England did the same, and that by the principles of the law of nations aside from any definite compact such as that of 1778, the injuries to our commerce afforded good foundation for diplomatic demand. Upon the second branch of the case we held, and in support of the position cited copiously from the contemporaneous negotiations and instructions of the American Secretaries of State, and from the correspondence and journals of the American ministers charged with the protection of American interests, that by the cancellation of the second article of the treaty of 1800 the United States set off the spoliation claims against those claims which France had against us, claims which our representatives thought of so much gravity and of so much value as to authorize an offer, refused by France, of many millions of francs for a release.
It seems unnecessary to repeat those voluminous citations, or to add to them, from the mass of correspondence which we have read, extracts which would be merely cumulative. We have carefully re-examined the question in the light of the re-argument, and nevertheless adhere to the conclusions reached last term after exhaustive discussion by counsel and patient and laborious investigation by ourselves, that these claims (as a class) were valid obligations from France to the United States, that the latter surrendered them to France for a valuable consideration benefiting the nation, and that this use of the claims raised an obligation founded upon right, and upon the Constitution (which forbids the taking of private property for public use without compensation), to compensate the individual sufferers for the losses sustained by them.
We do not decide nor have we attempted to decide that the conduct of the Government after the Eevolution and prior to the treaty of 1800 was or was not wise, proper, or justifiable, questions which are within the domain of the historian, and have not been submitted to us; we advise, whether in performance of their public duties, and in protection of the commonwealth, and in carrying out the directions of those having the right to give them, or in fulfillment of the powers and obligations conferred and imposed by the Constitution and laws, the statesmen of that period took such action in relation to private rights as raised an oblig'ation on the part of the Government to compensate the citizen.
*32 We are to see whether the claims urged on France were valid, whether each particular claim brought before us is one of the class defined in the statute, whether it was valid in law against France, and whether the United States became, by their action in 1800 and 1801, liable over to the individual.
The Government again urges that, as-there was war between the United States and France, the seizures were justifiable. This point we have so fully discussed in the opinion delivered at the last term that now it seems necessary only to sum up our conclusions and to consider one or two incidental points pressed with particular energy by the defense at this argument.
There were what were called by some “ hostilities,” by others “ differences,” by Congress “the system of predatory violence” (1 Stat. L., 578), by Justice Patterson “ a qualified state of hostility,” “war quoad-hoc," and by Justice Chase “ limited partial war.” The executive department said the conduct of France would have justified a declaration of war, but the United States, “ desirous of maintaining peace,” contented themselves “ with preparations for defense and measures calculated to defend their commerce” (Doc. 102, p. 561), while the United States ministers, speaking of the American statutes, wrote that “they did not even authorize reprisals upon [French] merchantmen, but were restricted simply to the giving of safety to their own till a moment should arrive when their sufferings could be heard and redressed.”
Congress did not consider war as existing, for every aggressive statute looked to the possibility of war in the future, making no provision for war in the present, and France, our supposed enemy, absolutely denied the existence of war. So then, the legislative, judicial, and executive branches of our Government recognized no war, no public solemn war, as existing, and the opposing party denied the fact.
It has been urged that the compact of 1800 was a treaty of peace; but we do not agree with this contention, for reasons which we give further on, after first considering the subordinate suggestion made relation to the caption of that treaty as found in print.
Curiously neither of the originals, that supposed to be in the custody of France nor that supposed to be in the Department of State, is obtainable. That belonging to this Government long since disappeared, and we are informed that a like fate- *33 has befallen the French copy. We are therefore forced to turn to the copies in print in various compilations of treaties to see what assistance can be obtained from a careful comparison of them. No material difference appears anywhere but in the caption, and there we should expect to find it, as the caption is not part of the treaty, and is usually drawn to suit the taste of the editor. The caption in the Revised Statutes runs as follows:
“ Convention of peace, commerce, and navigation with France, concluded at Paris September 30, 1800; ratification advised by Senate, with amendments, February 3, 1801; ratified by President February 18, 1801; ratified by First Consul of France, with Senate’s amendments, &c.”
Marten’s French collection of treaties contains the head-note, “ Convention entre la Republique Fran§aise et les Etats-Unis d’Amérique, signée le 30 Septembre, 1800,” and the editor says he had not a copy from the original treaty, but relied upon another publication. Le Clerc has a brief caption containing the word u peace.” The caption in the Bancroft Davis edition of treaties entitles the compact a “ Convention between the French Republic and the United States of America,” and gives the dates of signature, exchange, and proclamation; while the caption in volume 8 of the Statutes at Large, prepared in 1846, runs simply as follows: “ Convention between the French Republic and the United States of America.” It should be noticed as to this copy that the letter from the committees of Congress found at the beginning of volume 8 states that they “ learn that every law and treaty has been carefully collated with the originals in the Department of State.”
In Mr. Adams’s message, dated December 15,1800, transmitting the treaty to Congress, the head-note is exactly as in volume 8 of the Statutes (2 F. R., 295).
No inference, therefore, can be drawn from the caption, and the nature of the treaty must be gleaned from its contents, for if it concludes a war that fact will necessarily appear in some form as it does in the treaties of 1783 and 1814 with Great Britain, and in the treaty of 1848 with Mexico. The object of the treaty is stated to be a termination of the “ differences ” between the two countries, not of the “ war ” nor even of the £l hostilities ” alleged here to have existed between them. Next it should be observed, and this is a vital distinction, that the *34 treaty is of limited duration; it is to be in force for eight years only. Article Y speaks of a “misunderstanding”; and in the twenty-seven articles of the agreement, which cover the many different subjects at that time usually found in a treaty of amity and commerce, there is nothing to indicate that in the opinion of the parties there had been a public solemn war or that they were making a treaty of peace.
We are again cited to Bas v. Tingy (4 Dallas), a case which we considered very carefully in our previous opinion and from which we made very full quotation, holding that it decided the state of affairs under discussion to constitute partial war limited by the acts of Congress. The opinions of the Supreme Court speak very clearly as. to thé relations of the nations, but it is well to bear distinctly in mind that the court was dealing not so much with broad principles of international law as with the interpretation of statutes. Tingy claimed salvage for the rescue of the Eliza from a French privateer, and this claim he based upon the seventh section of the- Act March 2, 1799 (1 Stat. L., 716).
The act is eu titled “An act for the government of the Navy of the United States,” and the seventh sectiou makes provision for salvage to naval vessels for American vessels retaken from France; in construing this statute the court referred to the act of June 13,1798, as explanatory of the relations between the United States and France. This latter act being “An act to suspend the commercial intercourse between the United States and France, and the dependencies thereof,” does not in any way lead to the inference that public solemn war existed, for if such war existed a formal suspension of commercial relations would be unnecessary, and the contents of the statute negative the inference of war especially in the provision that no French vessels “ armed or unarmed, commissioned by or for or under the authority of the French Eepublic, or owned, fitted, hired, or employed by an3r person resident within the territory of that Eepublic, or any of the dependencies thereof, or sailing or coming therefrom, excepting any vessel to which the President of the United States shall grant a passport * * * shall be allowed an entry or to remain within the territory of the United States unless driven there by distress of weather or in want of provisions,” and these distressed vessels are to be allowed to provision and refit (§ 3), something certainly not permitted either in time of war or reprisal.
*35 The Act June 28,1798 (1 Stat. L., 574), also considered by the court, was intended as an addition to that of June 13,1798 (1 Stat. L., 565), and makes provision as to the amount of salvage to be received by American war vessels capturing French armed vessels during what the latter act describes as the “ aggressions, depredations, and hostilities ” encouraged and maintained “by the Government of France,” and which it does not describe as war.
The decision of the Supreme Court therefore goes to this extent and no more, that for the purpose of a recovery -of salvage France was an enemy to the extent the acts of Congress prescribed.
It has been urged that the treaty of 1800 was a solemn adjudication of the claims adverse to this Government, but we are of opinion not only that this position is negatived by the treaty itself, but that the negotiations which preceded that contract, and which may very properly be referred to for explanation if there be ambiguity in the document, do not support such a contention. Those negotiations having been commented upon by us heretofore, we need not now repeat them, while as to the expunged second article of the treaty, that upon which this contention hangs, it is sufficient to note the statement that as the ministers were “ not able to agree respecting ” the' treaties of 1778 and 1788, nor upon the indemnities “ mutually due and claimed, the parties will negotiate further on these subjects at a convenient time.” Meanwhile the treaties are to have no effect and the relations of the countries are to be governed by the treaty of 1800.
The claims made by France, for which the United States offered millions of francs for release, were national, and were based upon the provisions of the treaties of 1778. The claims for indemnity which we had constantly urged, and whose payment Pickering demanded as an ultimatum, were what are known as the “ spoliations claims.” In the entire negotiation, as we have shown in our former opinions, French claims based upon treaty obligations, past and future, were set up against American claims for illegal seizures, condemnations, and confiscations.
To be sure, Pickering makes a passing mention of national claims on the part of the United States, adding that, as national claims may probably be less definite than those of individuals, *36 and consequently more difficult to adjust, “ national claims may on both sides be relinquished.” (Doc. 102, p. 566.) An examination of the negotiations will show that such claims on our side were not pressed, while on the French side they were strongly urged.
No where is the contention more concisely formulated than in the communication of J. Bonaparte and his colleagues to the American Commissioners, wherein the French ultimata are set forth in tiiis form: “ Either the ancient treaties, with the privileges resulting from priority and the stipulation of reciprocal indemnities, or a new treaty assuring equality without indemnity.” (Doc. 102, p. 618.)
“At the opening of the negotiation,” said the Secretary of State to the American ministers, “ you will inform the French ministers that the United States expect from France, as an indispensable condition of the treaty, a stipulation to make to the citizens of the United States full compensation for all losses- and damages which they shall have sustained by reason of irregular or illegal captures or condemnations of their vessels and other property under color of authority or commissions from the French Bepublie or its agents ” (Doc. 102. p. 562); and he closed this instruction with several points “to be considered as ultimata,” the first of which was: “ That an article be inserted for establishing a board, with suitable powers to hear and determine the claims of our citizens for the causes herein-before expressed, and binding France to pay or secure payment of the sums which shall be awarded,” while the second point prohibited recognition of the old treaties.
There never was a substantial retreat on either side from these absolutely diverse positions, although there was considerable vacillation, until finally, in a spirit of patriotism, the representatives of the United States, abandoning Mr. Pickering’s ultimata, consented to leave the question still open, as it is found in the second article of the treaty. That article) in terms,, admits that there existed differences as to the treaties of 1778, and in terms it states that indemnities are “ mutually due and claimed.” If indemnities are mutually “ due” and indemnities are mutually “claimed,” the instructions and the negotiations prior to the treaty should show what those “ due” and “ claimed” indemnities are. They do show that upon one side they were claims for national indemnity under treaty obligations; on the *37 other side,'claims for indemnity for spoliations. As the treaty states that indemnities are “ claimed,” and as it states that indemnities are “ due,” we cannot agree that it operates as an adjudication of those claims upon which the indemnities are founded.
The jurisdictional act also negatives this assumption in its direction that we shall examine valid claims arising out of certain acts committed prior to the ratification of the treaty of 1800, thus negativing so far as this court is concerned any possible final adjudication by that international agreement. The statute instructs us not to investigate claims now valid against France, or claims which citizens now have against France, but valid claims which citizens “had” against France and which arose out of certain illegal acts committed prior to the treaty’s ratification.
By the action of the President and Senate on the yne side, and of Napoleon on the other,' the second article was expunged from the treaty upon agreement that “ the two states renounce the respective pretensions which were its object.” Thus, for the purpose of quieting the difficulties and dangers flowing from the treaties of 1778, to avoid the French claims, from which a release had been asked at an offered price of many million francs, to save the young Republic from internal dis.-sension and from danger from without, the American authorities surrendered to France the claims for spoliations upon which up to that moment they had most steadily and most strenuously insisted.
The alleged reprisals committed by this country upon French commerce were most limited in their nature, and hardly amounted to more than is allowed by the natural law of self-defense — that law which, by not obliging us to part with our lives, our limbs,.or orir property, allows us to defend our persons and our goods.
The reprisals were authorized and defined by acts of Congress, the first of which was passed iu June, 1798, and the last in January, 1799.
The Act June 25, 1798 (1 Stat. L., 572) authorized “the defense” of merchant vessels against “French depredations,” and to that end permitted the merchantman to oppose search, restraint, or seizure attempted by an armed French vessel, permitted the merclianr.man to repel by force any assault by *38 such a French vessel, authorized him to capture such an assaulting vessel, and permitted the merchantman to retake any other American merchantman captured by any armed French vessel.
The second section of this act, which provided for salvage, refers to the case of the capture of a French “armed” vessel, from which an assault or other hostility “shall be first made”; and section 3 requires a bond from armed merchantmen that they shall commit no “unprovoked violence” against the vessel of any nation in amity with the United States. Finally, the sixth section directs that when France shall stop the “lawless depredations and outrages hitherto encouraged and authorized by that Government against the merchant vessels of the United States, and shall cause the laws of nations to be observed,” the President shall instruct the merchantmen to submit to search and to refrain from violence.
As to the next act, passed, three days later (1 Stat. L., 574), it is only necessary to note that recaptures were to be restored after salvage paid the recaptors, nothing going to the Treasury. The 9th of July following an act was passed to “protect the commerce of the United States,” which authorized the President to give private armed vessels the same license and authority to take armed vessels of France, and to recapture American vessels, as public armed vessels of the United States had by law (1 Stat. L., 578, § 2); “armed” French vessels captured to be absolutely forfeited to the capturing vessel, which should receive also just and reasonable salvage on all recaptures. (§§ 5,0.)
The license and authority given the public armed vessels of the United States are found in the first section of this act of 9th July, 1798, and also in a prior act entitled “An act more effectually to protect the commerce and coasts of the United States,” approved May 28, 1798 (1 Stat. L., 561), which permitted the seizure only of such French armed vessels as had committed, or were hovering on our coasts for the purpose of committing, depredations on vessels belonging to citizens of the United States, and also permitted the recapture'of American vessels seized by the French. The act of July went further than this, and authorized the President to instruct the commanders of public armed vessels to “subdue, seize, and take any armed French vessel which shall be found within the juris *39 diction of the United States, or elsewhere on the high seas.”The authority, therefore, given to armed merchantmen by this statute was to subdue, seize, and take any French “armed” vessel, and to recapture any American vessel.
These statutes seem to us not only defensive in their character, but also marked by self-restraint and calm judgment. Notwithstanding the persistent attacks by France upon the American mercantile marine, no permission is given in this legislation to injure French commerce; armed vessels only are to be seized, and American vessels may be recaptured; peaceable French merchantmen may pursue their voyages unmolested.
A system of reprisals goes further than this, for it is based upon the principle of compensation, and is aggressive, not defensive, in spirit and intent.
“Beprisals [says Vattel, lib. 2, p. 342] are used between nation and nation to do justice to themselves when they cannot otherwise obtain it. If a nation has. taken possession of what belongs to another; if it refuses to pay a debt, to repair an injury, to make a just satisfaction, the other may seize what belongs to it and apply it to its own advantage, till it has obtained what is due for interest and damage, or keep it as a pledge until full satisfaction has been made. In the last case it is rather a stoppage or a seizure than reprisals, but they are frequently confounded in common language.”
Dr. Woolsey says reprisals consist in recovering what is our own by force, then in seizing an equivalent. We do not attempt to lay down any general rule of law on this question of reprisals, but a study of the authorities leads to tire conclusion that the action is affirmative and aggressive in character, having for its object compensation. The essence of reprisals has been said to be security — that is, the seizure of property for protection until just claims are settled, but we do not see that the principle of compensation is thereby changed, as the seizure of property for security must be directed by an effort to obtain security sufficient in amount to provide compensation should the demand for redress be unsuccessful.
The statutes we have cited have no such object; they are not aggressive in tlieir provisions or in the power they give, but entirely defensive, except in the instance of seizing armed vessels or retaking captured American vessels. The aim of the statute is defense of our merchantmen, not depredations *40 upon the commerce of France, nob compensation to the United States for losses already incurred, not security for demands heretofore made, but protection and safety in the future. It seems to us, therefore, that these acts lack the essential elements of statutes of reprisals. Two suggestions occur to us in concluding this point. If there were, a state of war or a state of reprisals existing, wliy should distressed French vessels be allowed to refit and provision in our ports as they were by the express provisions of the Act January 30, 1799 (1 Stat. L., 614) ? The Government of the United States could not have considered that it was at war, or that a state of reprisals existed, for the instructions of Mr. Pickering, the Secretary of State, and the mouthpiece of the Government, entirely negative such a supposition. (Doc. 102, pp. 561 et seq.)
In the face of these statutes the seizure of a merchant vessel cannot be justified on the one ground that she was armed; and more especially is this true as to seizures during the period when these claims arose, a period when, to guard against the pirates of the Caribbean, of the Malay Archipelago, or of the Algerine coast, it was customary for merchant vesssls to carry ijome armament.
“The"laws of neutrality and nations, in no instance that I know of [says Judge Bee, in 1795, while holding the District Court of South Carolina], interdictneutral vessels from going to sea armed and fitted for defensive war. All American India.men are armed, and it is necessary they should be so. * * * When the wisdom of Congress substituted an embargo for a declaration of hostilities, preparations of this sort might have been seen in every State in the Union. From the instructions and circular letter to the different collectors, it was clear that the vessels of the belligerent powers alone were comprehended in the restrictions. Even they might arm for defense; and if, as respected French vessels, it should appear doubtful whether their equipment was applicable to war or commerce, such equipment was declared lawful.”
Each case before the court must of course be examined separately upon the facts peculiar to it, and it is not impossible that such facts may be shown as to some of the private armed vessels of the United States as justified their seizure and condemnation.
The vessels whose cases are now decided were either unarmed or were armed for strictly defensive purposes.
The jurisdictional act requires us to inquire into - illegal con- *41 detonations, and it is urged on behalf of the defendants that all condemnations by the French courts are final and conclusive upon this court if the French court had jurisdiction. Many citations are made in support of this contention, among them the case of Baring and others v. The Royal Exchange Assurance Company (5 East., 99 et seq.), which may be taken as a fair illustration.
The American ship Eosanna, insured by the defendants, was captured and condemned by the French, whereupon plaintiffs sued on the policy and recovered. Lord Ellenborough, Ch. J., interrupting the argument, said:
“Does not this [French] sentence of condemnation proceed specifically on the ground of infraction of treaty between America and France in the ship not having those documents with which in the judgment of the French court the American was bound by treaty to be provided ? I do not say that they have construed the treaty rightly; on the contrary, suppose them to have construed it ever so iuiquitously; yet, having competent jurisdiction to construe the treaty, and having professed to do so, we [the court] are bound by that comity of nations which has always prevailed amongst civilized states to give credit to their adjudication where the same question arises here upon which the foreign court has decided. After arguing for hours, we must come to the same conclusion at last, that the French court has specifically condemned the vessel for an infraction of treaty which negatives the warranty of neutrality. Then, having distinctly adjudged the vessel to be good prize upon a ground within their jurisdiction, unless we deny their jurisdiction, we are bound to abide by that judgment. Whenever a case occurs of a condemnation by a foreign court on the ground of ex parte ordinances only, without drawing inferences from them to show an infraction of treaty between the nation of the captors and captured, and referring the judgment of the court to the breach of treaty, I shall be glad to hear the case argued, whether such ordinances are to be considered as furnishing rules of presumption only against the neutrality or as positive laws in themselves, binding other nations proprio vigoreP
The decision of the English court, then, goes to this extent, that in an action between individuals, the decree of the French court which had jurisdiction is final; so would it also be final as to the vessel, and the purchaser at the confiscation sale could rest upon the decree as good title against all the world.
But all this does not affect the position of the United States Government against the Government of France.
Lord Ellenborough says that no matter how iniquitous the *42 construction given the treaty by the French court, he, as a judge, is bound to follow it. But so is not the-Government of the United States. That Government could have objected either that the court was corrupt, or that there existed no treaty, or that there had been manifest error in construing it. All such questions may be outside the right of a court to consider, but they are within the right and form part of the duty of the political branch of the Government. If the French court, acting within its jurisdiction, construed the treaty iniquitously, the courts might not have power to remedy the wrong, but the owner had a right to appeal to his Government for redress, and that Government, when convinced of the justice of his complaint, was bound to endeavor to redress it.
The decree is an estoppel on the courts, but it is no estoppel on the Government; in fact, the right to'diplomatic interference arises only after the decree is rendered. Of course, precedents for cases of this kind are not to be found in the reports of courts, for no such case can, in the nature of things, come before a court unless by virtue of a special and peculiar statute, such as that under which we now act; but diplomatic history is full of them.
Butherforth (Institutes, vol. 2, ch. 9, p. 19), speaking of the right of a state to proceed in prize, says: •
“This right of the state to which the captors belong to judge exclusively is not a complete jurisdiction. The captors, who are its own members, are bound to submit to its sentence, though this sentence should happen to be erroneous, because it has a complete jurisdiction over their persons. But the other parties in the controversy, as' they are members of another state, are only bound to submit to its sentence as far as this sentence is agreeable to the law of nations, or to particular treaties, because it has no jurisdiction over them in respect either of their persons or of the things that are the subject of the controversy. If justice, therefore, is not done them, they may apply to their own state for a remedy; which may consistently with the law of nations give them a remedy either by solemn war or by reprisals. (See Dana’s Wheaton, 391.)”
This brings us naturally to another point, admitted as a •general principle, that appeal should be prosecuted to the court of last resort before there can be diplomatic intervention.
The exceedingly able British-American Commission which, sat in Washington in 1872 not only unanimously decided that *43 they had jurisdiction in prize cases in which the decision of the ultimate appellate tribunal of the United States had been had, a conclusion in which even the agent of the United States concurred, but also that they had jurisdiction when the claimant had not pursued his remedy to the court of last resort, provided satisfactory reasons were given for the failure to appeal. (Papers relating to the Treaty of Washington, vol. 6, pp. 88-90.) To this last conclusion the American Commissioner dissented; but even he held that a misfeasance or default of the capturing Government, by which means an appeal was prevented, was sufficient to excuse the failure to appeal. (Id., 92.)
The rights of the prize courts are the rights of the capturing-state. These courts are its agents, deputed by it to examine into the conduct of its own subjects before becoming answerable for what they have done, and the right ends when their conduct, has been thoroughly examined. Therefore the state has a right to require that the captor’s acts be examined in all the ways which it has appointed for this purpose, and on this principle is founded the doctrine that the complainant, unless he exhaust his appeal, shall be held to confess the justice of the decision. This presupposes, first, that there are appellate courts; second, that they are open to the complainant freely and honestly. The captor has no right to insist for his own protection upon the fulfillment of a form which he by his own acts preven s.
There is also a distinction, not often clearly drawn, between the validity of a claim per se and the right to enforcement. The justice of the claim is founded upon the injustice of the sentence. The appeal does not affect the merits of the claim; it does not palliate or destroy any wrong done; but it is simply a course provided for the captor’s protection, that he may fully examine into the acts of his own agents, through his other agents, the courts.
“ The whole proceeding, from the capture to the condemnation, is a compulsory proceeding in invitum by the state in its political capacity, in the exercise of war powers, for which it is responsible, as a body politic, to the state of which the owner of the property is a citizen.” (Dana’s Wheaton, note, 18G.)
Therefore the capturing state may waive such a demand, and not insist upon exhausting its right to further investigation, *44 and may waive it by failing to provide an appellate tribunal, or by preventing recourse to it, or in any other way which shows an intention not to insist upon this right of examination; but appeal or no appeal, the validity of the claim is founded upon the injustice to the claimants.
All writers lay down the principle that appeal should be taken from the inferior to the superior tribunal before resort by the injured Government to measures of redress; but. this principle is always coupled with the extreme measures of war and reprisals (see Rutherforth, supra; Grotius, bk. 3, ch. 2, §§. 4, 5), and there is no assertion in the writers that illegal capture necessarily does not found an international claim even when appeal has not been taken.
It was notorious that justice could not be obtained in the French prize tribunals in existence at the time of those seizures. Mr. Pickering, writing to Mr. Pinckney in April, 1797, said :
“The report of Mr. Mountflorence, which you transmitted, shows that the merchants in the ports of France who constitute the tribunal .of commerce in which our captured vessels are tried and, on the most frivolous and shameful pretenses, condemned, are often, if not commonly, owners of the privateers on whose prizes they decide.” (Doc. 102, p. 165.)
Consuls were at one time forbidden to appear before the tribunals in defense of absent owners. (Prizes Maritimes, vol. 2, pp. 317 et seq.)
“ Soon [says Cauchy], upon the occasion of the rupture with England, the signal was given for privateering. The French gave to it all that could encourage speculations half mercantile, half warlik; they put at the disposition of the owners part of the sailors of the fleet, even to strangers and neutrals ; they opened to them the storehouses of the state; they abandoned to the captors the total product of the captures, and they joined to that in certain cases premiums and rewards. They did more; they abolished with the offices of the admiralty the tribunal of prizes, and, in order to find judges more ready to sanction captures, they conferred upon the tribunals of commerce and of the district the judgment of these matters.”
“ It was erroneously that they had represented the benefits of privateering as a source of riches and public prosperity. In order to make the fortunes of four or five ports, the privateers were reducing the whole of France, a country by nature agricultural aud industrial, so that she had neither raw materials for manufactures nor supplies for her navy, nor outlets for her products, for they kept away from our ports the neutral ves- *45 seis which could alone supply the total absence of vessels sailing under the French flag.”
“On the other hand, were not the relations of the Republic with foreign Governments at the mercy of simple judges of commerce or of district, imprudently invested by the law with the terrible right to put France in a state of war against the wish and knowledge of her Government ? The Directory concluded that privateering, instead of receiving more extension and favor, ought to be restrained and regulated by law.”
“But this progress, forseen under the Directory, was not to be accomplished until after its fall. (Le Droit Maritime International, Eugene Cauchy, Paris, 1862, vol. 2, pp. 317, 318, 323-325.)
“The council of prizes, which was the supreme court of appeal in prize matters, was abolished in 1793. The 2!!th Germinal, year IV, the Council of Five Hundred passed a resolution thus expressed: ‘The appeals from the tribunals of commerce in matters oft prize shall be carried to the tribunals of the departments.” * * * Carried to the Council of the Ancients; this resolution was not opposed, and the 8th Floréal, year IV, it was converted into law. One only remembers too well (adds M. Merlin) how disastrous were the results of this strange legislation. The tribunals paid no attention in their decrees to the relation of France with foreign powers, whence arose numerous and pressing claims.
“However, to palliate the political inconvenience that might flow from thus vesting ordinary tribunals with the cognizance of maritime prizes, it was thought sufficient to authorize the commissaries near the civil tribunals to refer to the Government those matters which necessitated the interpretation of treaties, and in which the judgments of the tribunals might compromise the rights .of a friendly or neutral power; but experience was not long in demonstrating that this palliation was a vain remedy, and that the legislation ought to be deeply modified, the tribunals having shown the greatest hostility against the measure, some determining in spite of it the causes which the commissaries had referred to the Executive Directory; others denying to the commissaries of the Government the right to judge alone of the propriety or necessity of the reference. Matters had come to such a point that in the year VIII the minister of justice, Cambacéres, being instructed by the Consuls as to the amendments to be made to the legislation as to prizes, was authorized to say ‘ that privateering had become a system of brigandage, because the laws which had been applied to it were insufficient and bad; that they had heard complaints raised in all directions by merchants and foreign ministers, and that nevertheless the Government, convinced of the justice of these complaints, had always been without power to do right.’” (Traité de Prises, Maritimes pas Pistoye et Du-vardy, Paris, 1858, vol. 2, pp. 157, 158.)
*46 The form and expense of appeal were useless, for it was not denied that the adjudications below were in accordance with French ordinances, while it was contended that they were in violation of the rights of neutrals, measured either by treaty provision or by the precepts of the law of nations. Municipal law is not a measure of international responsibility, but it is binding within the jurisdiction of the state upon all its subordinate agents, including the courts. The decree in one of the cases before us, which was appealed to the civil tribunal, shows the following as the grounds for affirming- the condemnation below:
“The tribunal * * * considering the rules of 1704,1744, 1778, prior as well as subsequent to the treaty between France and the United States of America, emphatically demand that all foreign ships shall be furnished with a rile, authenticated by the public officers of the neutral port whence they have set out, under pain of being good prize. Considering' that the execution of these regulations has been ordered by article 5 of the law of the 14th of February, 1793; considering that a ship, which cannot be reputed neutral on account of a lack of papers sufficient to prove its neutrality, cannot be regarded but as an enemy, and, being so, its cargo is to be confiscated, according to the terms of article 7 of the ordinance of the marine of 1681 — title prize — says that it has been well judged by the judgment which has been appealed from, ami orders that it shall have its full and entire effect.”
So it appears that questions of treaty or international law were not ruled upon, the court being guided alone by the statutes of France. In the face of precedents of this kind an appeal was a vain and expensive form, as an affirmation of the judgment -below necessarily must follow. The cases were class cases, the condemnations (so far as we have yet seen) proceeded upon substantially the same grounds, and one appeal was decisive of all similar cases. The state’s right of investigation had therefore, in effect, been satisfied when it had affirmed in one case the legal principles applicable to many others presenting the same facts.
There were appeals also to the court of cassation, which were decided adversely to the claimant — necessarily so decided when the character and duty of the court are understood.
When the jurisdiction of the court of cassation is invoked there must take place a preliminary argument to determine whether the court under the particular facts of the case has or *47 has not jurisdiction. This settled in the affirmative by one of the divisions of the court known as the chamber of requests, the cause is referred either to the chamber of civil causes, or to the chamber of criminal causes, and the jurisdiction of these chambers is simply to secure uniformity in the construction of the statutes. Merlin says :
' “ As resource to the cassation is only an extreme remedy which has no other object than the maintenance of the legislative authority and of the ordinances, it cannot be made use of under the simple pretext that a case has been ill-judged in the main.”
The opinion of the council of state, dated January 18, 1806, speaking of the court of cassation, says :
“If the forms have been violated [below] there is no judgment, properly speaking, and the court of cassation destroys an irregular decree. If, on the contrary, all the forms have been observed, the judgment is reputed to be truth itself. * * * If, then, a decree should be in formal opposition to a written provision of the law, the presumption of its justice disappears, for the law is and ought to be the justice of the tribunals; wherefore the court of cassation has the right to annul in this case the decrees of the courts. (See Merlin, Eépertoire de J urisprudence.)”
What, then, could be the object of an appeal to the court of cassation when the court below had not misinterpreted the French law, especially as such an appeal would in no event have suspended the execution of the judgment ? (Code, art. 16, title, Courts and tribunals (1790), Tripier’s edition, 1865.)
The condition of affairs in regard to French courts is well illustrated by the letter from Pinckney, Marshall, and Gerry to the Secretary of State (October 22, 1797, Doc. 102, p. 467), wherein they quote their advocate as saying: “ It is obvious that the tribunal have received instructions from the officers of the Government to hasten their decisions, and that it was hardly worth while to plead, for all our petitions in cassation would be rejected.”
In the colonies matters were still worse than in France (Tuck’s Eeport, and citations therein, EL B. Ex. Doc. 194, 49th Cong. 1st sess.) and appeals were much more difficult. After the decision of a court, organized in some instances for the purpose of condemnation, by an officer of the Government, himself interested in privateers, or in some instances after a decision by *48 that officer in person (id, p. 9), the only remedy was to obtain an appeal to the mother country. This trouble and expense were practically useless (see in this relation Skipwith to Berlier, Doc. 102, pp. 833, 834). Communication between France and the colonies was difficult; the masters of the seized vessels were poor and were often stripped by the privateers of what little they had.
The condition of French prize tribunals was so notorious as to cause a change in admiralty law, the reasons for which were thus expressed by Lord Stowell:
“ It has certainly been the practice of this court, lately, to grant salvage on recapture of neutral property out of the hands of the French, and I see no reason at the present moment to depart from it. I know perfectly well that it is not the modern practice of the law of nations to grant salvage on recapture of neutral vessels, and upon this plain principle, that the liberation of a clear neiitral from the hand of the enemy is no essential service rendered to him, inasmuch as that sa,me enemy would be compelled by the tribunals of his own country, after he had carried the neutral into port, to release him, with costs and damages for the injurious seizure and detention. This proceeds upon the supposition that those tribunals would duly respect the obligations of the law of nations ; a presumption which, in the wars of civilized nations, each belligerent is bound to entertain in their respective dealings with neutrals. But it being notorious to all Europe,- in the present war, that there has been a constant struggle maintained between the governing powers of France, for the time being, and its maritime tribunals, which should most outrage the rights of neutral property — the one by its decrees, or the other by its decisions — the liberation of neutral property out of their possession has been deemed, not only in the judgment of our courts, but in that of neutrals themselves, a most substantial benefit conferred upon them, in .a delivery from danger against which no clearness and innocence of conduct could afford any protection. And a salvage for such service has not only been decreed, but thankfully paid, ever since these wild hostilities have been declared and practiced by France, against all acknowledged principles of the law of nations and of natural justice. When these lawless and irregular practices are shown to have ceased, the rule of paying salvage for the liberation of neutral property must cease likewise.”
“ No proof is offered that the maritime tribunals of France have, in any degree, corrected either the spirit or the form of their proceedings respecting neutral property generally; and, therefore, I shall not think myself authorized to depart from the practice that has been pursued, of awarding a salvage to the captors. (The Onskan, 2 Robinson, 300, 301.)”
*49 And later he said :
<! It is certainly true that the standing doctrine of the court has been that neutral property, taken out of the possession of the enemy, is not liable to salvage., It is the doctrine to which the court has invariably adhered till it was forced out of its course by the notorious irregularities of the French cruisers- and of the French Government, which proceeded, without any pretense of sanction from the law of nations, to condemn neutral property. On these grounds it was deemed not unreasonable by neutrals themselves that salvage should be paid for a deliverance from French capture. The rule obtained early in the war, and has continued to the present time. It is said that-a great alteration has taken place in the French proceedings, and that we are now to acknowledge a,sort of return of “ Satur* nia Reyna,.” This court is not informed, in a satisfactory manner, that any such beneficial change has taken place in the administration of prize law in the tribunals of France; and, therefore, it will continue to make the same decree till the instructions of the superior court shall establish a different rule. (.Eleonora, Oatharina, 4 Fob., 157.)”
It is important to note that during the period of these seizures neither the Government of the United States, which consistently supported the claimants’ contentions, nor the Government of France, from whom we were demanding redress, indicated the necessity of the form of appeal, nor later did the French, even in the long negotiations in which the validity of these claims was a principal subject of discussion, intimate in any way that they considered the appeal of importance or that they required it.
We conclude, therefore, that under these exceptional circumstances a claim properly founded in law is not excluded from our jurisdiction because the supposed remedy by appeal was not exhausted, and this we hold upon two principal grounds: First, that by the action of the French Government such an appeal was useless or impracticable; second, that as between the United States and France such an appeal as a condition precedent to recovery was in effect waived.
The decree condemningthe Industry proceeds upon the theory that the vessel’s role $ equipage was not in the form said to be required by article 25 of the treaty of February 6,1778, and also said to be required by certain French decrees declaring to be good and lawful prize every American vessel not having a role in a form prescribed.
*50 Colloquially a role d’équipage is usually treated as a crew list, whereas in French law it is a more formal paper, with more extended requirements.
To the first of the propositions contained in the court’s decree a very clear answer is found in the fact that the treaty does not demand, as we have already decided, that a crew list of any kind be carried on the vessel. Article 25 of that instrument calls for a “letter or passport expressing the name, property, and bulk of the ship, as also the name and place of habitation of the master or commander of the said ship, that it may appear thereby that the ship really and truly belongs to the subjects of one of jhe parties; ” this passport to follow a form annexed to the treaty. The ship was also to have a certificate as to cargo, showing she was not carrying contraband; but this certificate is not brought in question in these cases. The treaty therefore required two documents: First, a passport; second, a certificate as to cargo. The form of passport annexed to the treaty runs as follows:
“The name of the master and the name, hailing port, and tonnage of the vessel are given, together with the name of the port in which she is lying, as well as that of the port to which she is bound; the general nature of her cargo is described, and it is made known and certified that permission has been given the master to proceed after he shall make oath that the vessel belongs to one or more American citizens.”
Up to this point, therefore, the passport’s requirement is a description of the vessel and cargo, with the name of the master and a sworn statement as to the citizenship of the owners. Up to this point also the document follows exactly article 25 of the treaty, contains everything demanded by that article, and we are informed that it was the custom of the United States in the English version of the passport to halt at this point, while the versions in foreign languages contained the concluding portion, which we are now about to consider. ' (See original sea-letter of the Zebra; claim allowed under treaty of 1831; original MSS. Department of State.)
The master “ will,” it says further, keep the marine ordinances on board, in every port he “shall” show his sea-letter, “shall” give a faithful account of his voyage, and “shall” carry the colors of his country; and he shall (or will) enter in the proper office (remettra) what: — “a list, signed and witnessed, containing the names and surnames, the places of birth and *51 abode of the crew of his ship and of all who shall embark on board her, whom he shall not take on board without the knowledge and permission of the officers of the marine.”
There is no requirement here that the master shall carry on his vessel the document described, be it role d’équipage or crew list. The demand of this clause is that such a document be deposited or filed (remis) in a proper place, and whether this be done before or after the passport issue is not material. That instrument simply declares that such a list has been, or ■at least will be, before sailing properly filed, not carried. (Doc. 102, pp. 467 and 564; 2 Prises Maritimes, 53.)
The provision of Article IX of the treaty of 1788, relating as it does to consular rights in the arrest of deserting seamen, has no bearing upon this question. A semi-extraterritorial power is by that instrument given to French consular officers, and a way strictly marked out in which they shall pursue it; to arrest a deserter they must show him to be part of the vessel’s crew, and this they must do by exhibiting “ the registers of the vessel or ship’s roll.” This is a specific agreement relating to a specific subject, and has no reference to condemnations.
The Industry was -not condemned because the crew list had not been filed in the home port, but because the rdle d’égtiipage was not in form. The careful study and patient research of Government counsel have failed to develop any treaty requirement that such a document be carried on board the vessel, while the United States Government constantly and most peremptorily insisted that during all the period now under discussion the French demand was illegal and unauthorized by treaty or other law. The Pinckney mission told M. Bellamy in October, 1787 (Doc. 102, pp. 466,467), that none of our vessels had such a role j and that if they were to surrender the property taken from their fellow-citizens in cases where the vessel was not furnished with such a role the United States would become responsible for the property so surrendered, as “it would be impossible to undertake to assert that there was any plausibility in the allegation that our treaty required a role ÚJéquigiageP
Pickering’s interesting instructions to the Ellsworth mission, dated October 22,1799 (Doc. 102, p. 561), contain a very definite statement of the position of the Government on this subject. He lays down as—
*52 “An indispensable condition of the [proposed] treaty a stipulation to make to tbe citizens of the United States full compensation for all losses and damages which they shall have sustained by reason of irregular or illegal captures or condemnations of their vessels and other property. And all captures and condemnations are deemed irregular or illegal when contrary to the law of nations generally received and acknowledged in Europe, and to the stipulations in the treaty of amity and commerce of the 6th of February, 1778, fairly and ingenuously interpreted while that treaty remained in force, especially when made and pronounced:
“(1) Because the vessel’s lading, or any part thereof, consisted of provisions or merchandise coming from England or her possessions.
u(2) Because the vessels were not provided with the roles Wequipage prescribed by the laws of France, and which it has been pretended were also required by treaty.
“(3) Because sea-letters or other papers were wanting, or said to be wanting, when the property shall have been, or shall be, admitted or proved to be American. Such defect of papers, though it might justify the captors and exempt them from damages for bringing in such vessels for examination, could not with reason be a ground of condemnation.”
Further on in the instruction Mr. Pickering says:
“There never was, indeed, any intimation on the part of France from 1778, when the treaty of amity and commerce was made, until the passing of the decree of the Directory,in March, 1797, that a role d’équipage, other than the ship’s roll or the shipping papers [see act 1790], would be required. It was then suddenly demanded, and the decree * * * was instantly enforced and became a snare to.the multitudes of American vessels, which, for want of previous notice, would not have on board the document in question, if their Government should permit them to receive a document which they were under no obligation to produce. For it cannot with any semblance of justice be pretended that the vessels of one nation are bound to furnish themselves with papers in forms prescribed by the laws of another. And if we resort to the treaty of 1778, or to the sea-letter or passport annexed to it, on which letter the Directory pretended to found their decree concerning the role di equipage, we shall see that these words are not to be found in either.” (Id., 564.)
For the purpose of argument, however, we may for the moment admit the French contention in this matter — a contention now adopted by the defense — and concede that, by relation back through the passport to the twenty-fifth article of the treaty of 1878, it became the duty of the vessel’s master not *53 to file a crew list at the port of departure, but to carry on his vessel a róle d’équipage drawn and certified in accordance with the ordinances and decrees of France, and not necessarily in accordance with the statutes of the United States, to which country his vessel belonged and of which country he was a citizen.
The position being admitted, we must consider the amount of penalty which the vessel is to suffer if such a role be lacking. What penalty does the treaty impose? That instrument says nothing about a róle or crew list, but demands a passport, which latter document it is urged requires the presence of a róle on the vessel; the treaty penalty, therefore, for the lack of this róle, not mentioned in the body of the instrument, cannot be greater than the penalty for the lack of the passport which is there mentioned. The object of the passport provision is clearly to be gathered from the wording of the treaty: “To the end that all manner of dissensions and quarrels may be avoided and prevented,” the twenty-fifth article, it is provided that when either party is at war the vessels of the other shall be furnished with passports describing the name, property, and bulk of the ship, together with the name and abode of the master, so that it may appear that the vessel “ really and truly belongs to the subjects of one of the parties.” Such is the substance of the twenty-fifth article, whosé object as clearly expressed is not to affix penalties, but to avoid “ dissensions and quarrels.”
The twenty-seventh article provides, that if a merchant ship of either party meet a man-of-war or privateer of the other, the armed ship, “for the avoiding of any disorder,” shall remain out of cannon-shot, send boats to the merchantman; put no more than two or three men on board, to whom the master shall show his passport; having done which he may pursue his voyage, and the vessel may not be molested or searched in any manner, nor chased, nor forced out of her course. The passport, then, being given for the purpose of preventing “ dissensions and quarrels,” is by virtue of its presence alone to free the ship from search, chase, or forced deviation. No penalty is affixed for the lack of this passport other than what may be inferred, as, for example, that without it she would be liable to detention and search, and possibly to investigation by a prize court *54 or other competent tribunal as to the honesty of her character and the innocence of her voyage.
No treaty penalty being affixed for the absence of a definitely prescribed document, how can one be held to exist for the absence of a subsidiary document which the treaty does not require the master to exhibit, even if its presence on board be necessary ? An American vessel boarded by a French officer need only, so says article 27, do one thing, need only show one paper, to wit, his passport •, this done, he may immediately proceed.
No rule of international law has been called to our attention, and none is known to us, which, in the absence of specific agreement to the contrary, requires the presence on vessels of any particular document. Some papers undoubtedly should be carried for protection; that is, carried for the benefit of the ship, to divert suspicion, to avoid detention and delay, and to afford at least prima facie proof that she is what she pretends to be, an innocent vessel engaged in legitimate business. The nature and character of ships’ papers is, however, usually a matter of municipal regulation to which foreign vessels must conform or incur certain reasonable penalties, enforceable within the territorial jurisdiction of the enacting Government. Many examples of municipal acts of this nature may be found in our own statute books.
Speaking, generally, however, aside from local regulations not enforceable by the Government of one nation over the vessels of another on the high seas, the class and kind of papers to be carried by a merchantman are prescribed by his own Government, and as between him and a foreign vessel of war these papers ar prima facie proof of innocence and honesty ; but as they are not conclusive on these points, so is their absence no more than the foundation of a reasonable suspicion deserving-inquiry into the true character of the vessel and voyage. (See, also, Merlin, 2 Frises Maritimes, 51.)
“It is of the highest importance [says Ortolan] that a vessel be in position to prove her nationality. The flag- is the distinctive evident sign of the vessel’s national character. Every state has its particular colors under which its citizens sail. * * * But this distinctive sign cannot be the only one, for if it were it would be easy to disguise the nationality of a vessel. Therefore, to provide clear proof of this nationality, ships’ papers or sea-letters are required, with which every merchant *55 man should he provided. The number, nature, and form of these papers are regulated by the law of each country, usually through the provisions of codes of maritime commerce. (Ré-gles Internationales et Diplomatic de la Mer. Ortolan, vol. 1, p. 174.)
“The right to visit [says Hautefeuille] must be confined to an ascertainment through examination of official papers of the nationality of the vessel met, and also in case she is bound to an enemy’s port, whether faithful to her duty she carries no arms or munitions of war; that is, that she is not guilty of interference in the hostilities. These two single points ascertained, and that only by documents coming from the neutral sovereign, or his delegates, the cruiser should retire and allow the vessel, now recognized as neutral, to continue her voyage.” (Hautefeuille, vol. 3, p. 428; Parsons-Shipping, vol. 2, pp. 475-477.)
The lack of a particular ship’s paper may be punishable under certain circumstances within local jurisdiction as a police measure, but never, so far as we know, by absolute confiscation when it is shown that the vessel is innocently pursuing a legitimate voyage. An accident is easily supposable by which, after leaving port, and while on the high seas, all the papers of a ship may by fire or water be destroyed. On that account is she to be confiscated ? We know of no rule of law, municipal or international, which would authorize such a course.
The Industry, it is said, did not have a proper role ¿V equipage. The treaty did not require any,, or, if it did, then it punished the lack of the role by detention, search, and inconvenience only. The crew list is a paper usually carried on a merchant vessel, but its absence is not, by internaSonal law, punishable by confiscation.
After all the discussion between the two Governments in regard to the role W equipage, we find in article 4 of the treaty of 1800 provision for a passport identical in form with that of 1778, which could only have been so therein inserted because both Governments had agreed upon what had always been contended for by the United-States, and finally admitted by France, that this form imposed upon the shipmaster no obligation to carry on board his vessel the document technically known to the French law as a role eVequipage.
That France came openly to this position is shown by various cases.
In the case of the Louise (13 Thermidor, year IX) the council of prizes decided, that the laws of France relative to róles *56 d’équipage should not be applied to foreign ships, it being sufficient that their róles conformed to the laws of their own country. (Traité des Prises Maritimes, Pistoye et Duverdy, vol. 1, p. 484.)
In the cases of the Elizabeth (17 Pluviose, year VII) and of Les deux Amis (3 Messidor, year VIII) it was held that even a failure to produce a proper passport or sea-letter did not warrant condemnation if the neutrality of the vessel sufficiently appeared from other papers or indicia on board. (Id., pp. 439, 479.)
The commissioner of the French Government very thoroughly presented this whole question in the case of the Pégou, on trial before the council of prizes. (Traité des Prises Mari-times, Pistoye et Duverdy, vol. 2, pp. 51 et seq.)
Among other things, he said that certainly the regulations of 1744 and 1778 and the orders of the Directory required aróle d’équipage, certified by public officers at the port of departure. Certainly, also, the role Wéqulpage is not set forth in the treaty of 1778 as among the documents required to show neutrality. Whether the treaty or the French decrees should prevail he does not decide, but starting with the principle that all questions of neutrality are questions of good faith, in which actual facts, not simply appearances, must be examined, he holds that the absence of a required document or an irregularity in form does not authorize condemnation-as prize. The truth must be sought, and that not by technical forms j simply omissions or irregularities should never obscure the truth if it be otherwise proved. The essential question is, whether the ship is or is not in fact neutral. It is not of importance that legislators have thought it their duty to require the presentation of particular papers ,• the severity of the legislators is always subordinate to the surrounding circumstances which alone lead to conviction. The neutrality should be proved, but this may be done notwithstanding the omission or irregularity of certain forms. On the other hand, fraud may be uncovered, though sought to be concealed under deceiving appearance. All thorns and all subtleties of law must be thrown aside “ il faut procéder par bonne et mure déUbération et y regarder par la conscience.” And the court followed his advice thus officially given.
We are irresistibly forced to the conclusion that a condena- *57 nation based simply on the absence of a role d’équipage or upon its informality was illegal.
We do not, however, hold that the absence or informality of a ship’s paper may not create a suspicion calling for explanation, or that its absence or informality may not, in connection with other evidence, give good ground for investigation and suitable punishment. The cases now before us do not present this issue. In the case of the Industry, Benjamin Hawkes, master, for example, there is no allegation in the decree of the tribunal, nor is there anything in the proceedings tending to show that she was not what she pretended to be, an American vessel owned by citizens of the United States, honestly pursuing a legitimate and peaceful voyage. The grounds of condemnation were solely that the role d’équipage which the vessel had on board was not in form, being signed only by one notary public “without the confirmation of witnesses,” and there being written on the back of said rólé an unsigned certificate that a réle d’équipage was not necessary.
It will probably become important to consider in the future the proposition of the defense that the captured vessel is required to prove her innocence — that is, that the onus probmdi rests upon her in prize proceedings. In this case, however, there is no allegation that the vessel was violating neutrality or violating any law of nations or any law of France, other than that which demanded a róle d’équipage in a prescribed form. Consideration of this question is therefore reserved.
Some of the points presented in the argument we do not consider more in detail, as they have either been discussed by us before, or, in our judgment, are decided in the conclusions we have reached upon other contentions to which they are subordinate.
We thank counsel, both those representing the claimants and those who appeared in behalf of the Government, for the valuable assistance they have rendered the court by the thorough presentation of the many and complicated questions involved in these cases. ■
Motion denied.