Atkxnson, J.,
delivered the opinion of the court:
The sloop Townsend, a small New England vessel, built and registered in the State of Maine, sailed from the State of Massachusetts August 28, 1798, bound for the British island of Antigua. Her cargo consisted of lumber, shingles, staves, and fish. The vessel was owned by three American citizens of the State of Maine, who also were the owners of the cargo. In the early part of October, 1798, while on her outward voyage to Antigua, she was captured by the French privateer Le Pellitier, and was conveyed to Guadeloupe, arriving October 10 of that year, when vessel and cargo were condemned “ as good prize ” by a French court sitting at said place, for the reasons that she had not on board “a role d'equipage and invoice of cargo” notwithstanding the fact that the evidence showed (translations by the interpreter of the French court) that she carried the following papers:
“ No. 1. Her register, showing that Joseph Campbell, from Boothbay, in the State of Massachusetts, mariner, together with William McCobb, esquire, and Ephraim McFarland, mariner, both from Boothbay, in said State, are the owners. Dated at the port of Wiscasset, October 11th, 1797.
“ No. 2. Her sea letter from the port of Boothbay for Antigua, with a cargo of boards, staves, shingles, and codfish. Dated August 28, 1798.
“ No. 3. Agreement of the captain with his crew for Antigua.
“ No. 4. His clearance from the customs-house in Wiscasset for Antigua, with a cargo of sixty thousand feet of boards, *144 four thousand staves, sixty-two thousand shingles, thirty quintals codfish.
“ No. 5. Instructions from the owners to. the captain for Antigua or any other port not prohibited by the laws of the United States, etc.
“ No. 6. A printed notice concerning the action of masters of American vessels in case of seizure or detention of their men by any foreign power.”
When the sloop arrived at Guadeloupe, the master, after filing- a protest, was imprisoned, remaining therein for the period of about three months. While in prison he was examined on preparatory interrogatories, and among other things testified that the vessel and cargo were owned by three American citizens, viz, Joseph Campbell, William McCobb, and Ephraim McFarland; that the vessel cleared from Wis-casset, Massachusetts, U. S. A., bound for Antigua, and that the cargo consisted of boards, staves, shingles, and thirty quintals of codfish, a part of the latter being the property of the crew. Shortly after his return to the United States, he appeared before a notary public and made a sworn protest against the condemnation of the vessel and cargo by the French court.
Three points were raised by counsel for the defendants in the trial of this case against any allowance by the court in favor of the claimants, to wit :
1. The decree of condemnation alleges the absence of register as a ground of seizure.
2. There was no invoice on board, and consequently there can be no recovery for the cargo.
3. There can be no recovery for insurance, for the reason that the condemnation took place prior to the payment of the premiums' for said insurance.
We do not consider the first objection well founded, because we fail to find in the decree of condemnation any other reason assigned for such action (except a mere quotation from the arrete of the agent of the executive directory in the West Indies) than the absence among the ship’s papers of a role d^équipage and an invoice of the cargo. The translations made by the French interpreter of the court show conclusively that the papers of the vessel were regular; that she *145 carried everything, including register, required by the French decree, except a manifest and a role ¿^equipage; that American ownership of vessel and cargo were conclusively shown; and further, that the cargo was not contraband of war.
The absence of a role d? equipage as evidence of the neutrality of a vessel at sea, is no longer a debatable question, because it has long ago been settled by this and other courts, including those of France, that the possession of such document is not necessary to establish the neutrality of a vessel on the high seas. (Schooner Sallie, 21 C. Cls. R., 340, 400, and Schooner Industry, 22 0. Cls. R., 1, 49.)
From what we have said above, we are clearly of the opinion that the condemnation of the sloop was illegal; and we are also of the opinion that the condemnation of the cargo, on account of the absence of an invoice of cargo or manifest, was likewise illegal. The evidence before the prize court was both documentary and by depositions. The register, the sea letter, the agreement of the captain with his crew for Antigua, the clearance from the customs-house at Wiscasset, together with the instructions of the owners and freighters of the vessel to the captain thereof prior to sailing, all- of which were verified by the interpreter at the trial of the case before the prize court at Guadeloupe, clearly show that the owners of the vessel were the owners of the cargo, and that they were all American citizens. This, it seems to our minds, was sufficient evidence to establish the neutral ownership of the cargo, especially in view of the fact that the cargo itself showed that it was innocent commercial property and was consequently not contraband of war.
The French council of prizes, January 18, 1801, in passing upon the absence of one or- more papers of a ship at a trial by a prize court, decided that — •
“ The judgment is founded in justice. It is based upon the provisions of the regulation of 1778. Its conclusions can not but be approved by the council which has neither seen nor been able to see in the instruction of the owner to the captain anything but a ship’s paper as authentic, as legal, as conclusive of neutrality, as the laws, justice, and reason require.
“ The denomination of the paper does not destroy its contents. It is not such or such a ship’s paper under such or *146 such denomination that the law requires, but proof of neutrality. That of the cargo is clear, since the paper in question combines all the characters of the papers enumerated by the law.
“•The manifest is not embraced according to the ordinances and regulations in the enumeration by name of ship’s papers, but it is impliedly comprised in the general expression of the law ‘ and other papers establishing neutrality; ’ any other paper establishing this proof fulfills the letter, the spirit, and the purpose of the law. That is so true that the council has received as a bill of lading a general manifest in a case on the report of Citizen Lá Coste.
“ If the manifest, of which the law does not speak, is impliedly comprised in the collective expression ‘ and other papers,’ it follows necessarily that the instruction of the owner to the captain should be ranged in the class of other papers, since it comprises everything which the charter*party, the invoice, the bill of lading, and the manifest could regularly import.” (1 Pistoye & Duverdy, 438, 439.)
This court decided in the case of the schooner Hazard (39 C. Cls. R., 376) that the protest of the master of a vessel as to its neutrality should have great weight as over against the absence of some of the papers of a vessel in condemnation proceedings. The opinion says:
“ We know now from the subsequent protest of the master that the cargo of this vessel was neutral. The careful representative of the Government concedes this while properly contending that the proceedings resulting in condemnation must not be determined by subsequent developments, but by the proof in hand at the time. Neutrality was the thing to be proved to those rightfully charged with the privilege of considering the fate of the prize. But was neutrality proved ? The report of the capture shows that the vessel was seized because the clearance was in contravention of the laws and customs of France. The absence .of papers was not suggested nor suspicion raised at the time in regard to the- neutral character of the freight. The vessel was registered, but notwithstanding she showed her sea letter the prize court condemned both vessel and cargo on the same ground. The oral testimony before the tribunal was direct that the proprietary interest was in citizens of the United States. While the question of going outside the papers is not free from doubt, we think, on the whole case, this oral testimony was .competent and sufficient to exonerate the cargo. This seems to us, upon reflection, to be more nearly in consonance with the rules of international law and the reasons which under *147 lie the action of nations in dealing with each other in time of war than a rule making papers the sole test.”
It was decided in the case of the Industry (22 C. Cls. R., 1) that the lack of a particular paper of a vessel may be punishable under certain circumstances within local jurisdictions as a police measure, but never by absolute confiscation, when it is shown that the vessel is innocently pursuing a legitimate voyage. An accident is easily supposable by which, after leaving port and while on the high seas, all the papers of a ship may, by fire or water, be destroyed. On that "account should the ship an dcargo, or either of them, be confiscated? We know of no rule of law, municipal or international, which would authorize such a course.
In Hoofer's case (22 C. Cls. R., 1) it was held that, while it is true the onus probandi is upon the captured vessel in all prize court proceedings, in order to clear herself from suspicion, yet no particular paper is indispensable to accomplish such purpose, and that an honest, commercial, lawful voyage may be shown though no paper of any sort be presented.
In the disposition of this class of cases this court has uniformly decided that all questions of neutrality are questions of good faith, in which actual facts, and not simply appearances, must be looked into, and that the mere absence of a particular document, or an irregularity in form, does not authorize condemnation as good prize in any case. The truth must be sought, and that not by technical forms. Simple omissions or irregularities should never obscure the truth if it be otherwise proved. The essential question is whether the cargo is or is not, in fact, neutral. It is not of importance that the municipal law of one government requires the presentation of particular papers. The severity of the legislators is always subordinate to the surrounding circumstances, which alone lead to conviction. The neutrality should be proved, but this may be done notwithstanding the omission or irregularity of certain prescribed forms. (Schooner Hazard, 39 C. Cls. R., 376, 380.)
The case of the schooner Betsy (36 C. Cls., 256), upon which the defendants rely as sustaining their contention that the seizure of the cargo of the Townsend was a proper ' *148 procedure, is by no means on all fours with the case before us. The Betsy carried a manifest showing of what her cargo consisted, but she produced no document or other evidence which showed that it was owned by American citizens and not by belligerents. The claimants in that case relied mainly upon a New England custom .to the effect that among vessels engaged in the trade with the West Indies no proof of ownership was necessary when the cargo belonged entirely to the owners of the vessel carrying it. The court very properly held in that case “ that the courts of another nation were not bound to take notice of a local custom utterly at variance with the provisions of the treaty of 1778 and the requirements of international law;”, that it was necessary to show whether the cargo was the property of neutral or belligerent owners, and that a prize court of a belligerent power ivas justifiable in condemning property as good prize unless neutrality of ownership is clearly established. The court further held in that case as follows:
“ Ownership is one thing and neutrality is another. The French prize court was not interested in the question whether the cargo belonged to this or that American citizen, but in the question whether it ivas the property of neutral or belligerent owners. A prize court .of a belligerent power' was entitled to have the neutrality of a cargo established. The treaty of 1778 was based upon the principle that free ships make free goods; but it also required £ that if either of the parties should be engaged in war the ships and vessels belonging to the subjects or people of the other ally must be furnished with a sea letter or passports made out according to the form annexed to the treaty, and likewise that such ships ■should be provided always with a certificate containing the several particulars of the cargo.’ (Art. XXV.)
“ The manifest on board answered this last requirement, so that if the vessel had been seized before the abrogation of the treaty and had carried a proper passport her cargo would have been exempt from seizure. There is no evidence in the case except a register, a manifest, and the local custom above referred to. It is recited in the decree that she had a sea letter not properly attested, but it does not appear that the sea letter ivas that prescribed by the treaty, and if it were it would not have been obligatory, we think, upon France after the abrogation of the treaty by the act of 7th July, 1798 (1 Stat. L., p. 578), on the part of the United States.
*149 “ It seems, then, only too apparent, so far as now appears, that the vessel carried nothing to establish the neutrality of the cargo. There is no protest on the part of the master in the case, showing- the circumstances of the seizure and condemnation, or that he had asserted the rights of American owners, or offered proof of the neutrality of the cargo, or established any ground upon which this court can hold that the condemnation was illegal and unjust. The fault was the vessel’s. Upon this evidence, and want of evidence, it must be held that the prize court was justified in decreeing condemnation.”
In the case at bar the Townsend carried a register, a sea letter, the agreement of the captain with his men, showing the destination of the vessel to be the port of Antigua, clearance papers from Wiscasset, U. S. A., instructions from the owners to the captain for Antigua, a printed notice showing what action should be taken in case of seizure, and after the sloop was seized by the Le Pellitier the evidence of the captain, of the Townsend was taken while he was in prison and was read at the trial, which stated positively that the owners of the cargo were the same persons Avho owned the vessel (which fact was also stated in the decree of condemnation): that all of them were American citizens, and therefore in no respect were belligerents; while, as shown above, the only evidence presented in the case of the Betsy relied upon to establish the neutrality of her cargo was a register, a manifest, and the local New England custom to which we have referred.
We agree with the counsel for the defendants that the claim for the insurance on the sloop and cargo is not valid as against France, for the reason that the same was effected by two policies dated the 11th and 21st of December, 1798, and as the condemnation of sloop and cargo took place October 18, prior to the issuance of the same, France can not be made liable for the premiums therefor, nor is the United States chargeable therewith: Consequently no allowance can be made in favor of claimants for premiums of insurance so paid. (Schooner John Eason, 37 C. Cls. R., 443, 447.)
The theory upon which a premium of insurance has been deemed recoverable in this class of cases is that the payment *150 of the premium adds so much to the value of the property insured; but the liability of France is limited to the value of the property at the time of its illegal seizure or condemnation and can not be augmented by subsequent transactions -between owners and insurers.
There was another 'question of vast importance raised in the trial of .this case, viz, that immediately following the capture of the Townsend and her arrival at Guadeloupe her captain was imprisoned and was not allowed to be personally present at the trial before the prize court, although it is established that his deposition was taken while he was in prison and was read at the hearing of the case. Counsel for the United States insists that he was duly heard in his own defense, although not personally present at the trial, yet he was nevertheless legally heard, and, as a matter of fact, “ had his day in court.” lie further insists that it is a privilege and not a right for a litigant to appear in court by counsel. Without attempting to pass upon the statement of counsel as to the rights of litigants. to appear in legal tribunals personally or by authorized attorneys, under the customs and rules formerly and at the present time which prevail in this and other countries,- we shall advert only' to the decisions of this court in such matters.
In the case of, the brig Sally (37 C. Cls. R., 74) it was held that when a- vessel is seized the master should have the right to appear and defend his ship and its cargo against the alleged illegality of the voyage, and by refusing him such privilege he was denied due process of law. It was also further decided in that case that “ the fact of sale and the absence of the master from the judicial proceedings in which it may be the ship was condemned.”
In the case of the snow Thetis (ibid., 470) the right of the master or some other officer of the vessel in duress to be present in a court during condemnation proceedings is clearly clearly and unequivocally reaffirmed, by quoting with ap-from Sir William Scott the following paragraph:
“ Before the ship or goods can be disposed of by the captor there must be a regular judicial proceeding, wherein both parties may be heard, and condemnation thereupon as prize *151 in a court of admiralty, judging by the law of nations and treaties.”
The right of an officer to defend his vessel after seizure has been made is carefully set forth in the case of the schooner Maria (39 C. Cls. R., 147). In that case it was decided substantially that while it is true the seizure and condemnation of a vessel may have been made for good cause, yet it was a right of the master to be present at the prize court to defend the owners, and where he was prevented by imprisonment from so doing the proceeding was ex -parte and wholly void.
A prize proceeding is an action in rem, and where the master of a captured vessel absents himself on his own volition, such act would not operate to defeat a condemnation otherwise valid. And while, the examination of a master in preparatorio, while under that duress which is implied from the mere capture of his vessel, would be competent evidence to be considered in the first instance for the condemnation of the vessel, it would not be if the master, in addition to such implied duress, were imprisoned and the examination in preparatorio was behind prison bars, because in such case the master would be deprived of his liberty and his answers might bear the impress of such imprisonment. ■ The latter is this case, and, therefore, if the seizure and condemnation were otherwise legal, that of itself, under the decisions of this court, is sufficient to justify the court in holding that such condemnation was illegal. A prize proceeding is no exception to the universal principle of justice, which requires a proper legal hearing before condemnation can be ordered. (The Snow Thetis, 470, supra; The Good Intent, 36 C. Cls., 262, 265.)
The findings of fact and conclusions of law will be reported to the Congress, together with a copy of this opinion.