Howry, Judge,
dissenting:
The brig Sally, whereof John Beaty was master, sailed on a commercial voyage from Baltimore documented for and with instructions to land at St. Bartholomew, a Swedish island. The vessel was seized to the leeward of Antigua by *142 a French privateer, taken as good prize to the tribunal of commerce sitting at Basse-Terre, and by the prize court condemned with its cargo. Under the act of January 20, 1885, 23 Stat.L., 283, the present proceeding was instituted against the United States for what is now claimed to be an illegal condemnation. The cargo of the brig consisted of 2,604 bushels of corn, 532-J barrels of flour, and 1,500 staves. The ground of condemnation translated from the French (but incorrectly set forth in the findings of the court) is as follows:
“ It is proven by the letters found hidden on board and addressed by the owners to Henry Anderson at Antigua on February 8 and 18,1797, that the clearance of the brig Sally for St. Bartholomew is simulated; that the true destination is the island of Antigua; that it is a sequel of shipments of provisions for the British Army; that the passport issued for the island of St. Bartholomew has thus been infringed.”
Thus it appears that the vessel was carrying foodstuffs, not to a neutral port but to an island of one of the belligerents for the use of the British Army, and that 'belligerent an enemy of France.
Out of the language of the decre» the majority think that the only fact found in the decree of condemnation was that the brig was destined for Antigua; in other words, “ sequel ” as used in the decree was only an inference which the prize court drew because the brig was going to Antigua, but that this court has the same right to draw its inferences from the single fact in the case as the prize court on its knowledge of the situation had. Further, that a false documentation of the brig was not evidence of the intention to supply provisions to the British Army. There were no qualifying words in the decree. The use of the word “but” in the findings of this court does not conform to the prize court decree.
For cases of this class the Court of Claims is neither a court of appeals to set aside the findings of. the prize court nor a court of errors to destroy the effect of the findings which condemned the ship.
Surprise.was expressed by the Supreme Court in the recent case of The John li Estate v. Brown, 235 U. S., that courts *143 of another jurisdiction, sitting long after the action of another court, should know its duties and powers so much better than there shown as to be entitled to pronounce the proceedings in the court of first jurisdiction void, adding that the caution required in such a venture has been stated and restated from the case of United States v. Percheman, 7 Pet., 95, to Michigan Trust Co. v. Ferry, 228 U. S., 354.
In cases relating to the burden of proof the innocent purpose must be shown by claimant where any doubt exists as to the intention — carrying out the general rule asserted in The Dolphin, 27 C. Cls. R., 276; The Tom, 29 Ibid., 96, and The John, 22 Ibid., 454. In Hooper’s case, 22 Ibid., this court stated the general rule that the burden of proof in prize proceedings is on the vessel. So there is nothing to show that this vessel cleared itself of the causes assigned for the prize court’s decree.
Finding I, as stated by the majority of the court, should be amended so as to show that the vessel was not bound “ for the island of St. Bartholomew or the island of Antigua.” The finding should show that the vessel was falsely documented to St. Bartholomew, but was captured while undertaking to go to Antigua, thus proving the false documentation and sustaining the prize court decree, not only in going to Antigua but for the purpose stated in the decree that the cargo was designed to supply the British Army on that island.
The prize tribunal was a court of competent jurisdiction, with the right to draw its conclusions by stating the ultimate fact from all the evidence before it. This court is without jurisdiction to state anything in the nature of an ultimate fact in the present case, except upon proof of the most preponderating character that the vessel was not taking a cargo to a belligerent enemy and also upon proof that the vessel was carrying the proper certificate under Article XXV of the treaty. In all cases where the decree of a prize court is assailed the ground of the condemnation must appear to be insufficient under international law or under a treaty where applicable. On the facts recited in the decree the burden of disproving the recitals is always upon those disputing the allegations, and this proof must be of the *144 most satisfactory character before a decree can be set aside on facts sufficiently appearing in the decree. Any other rule would provoke conflicts between nations at war and neutrals. No country with power enough to resist would tolerate any different rule. We can not go behind the recitals of the decree and its results. The right here is restricted to the effect of the recitals, with no power to deny that the shipment was to the enemy of the French.
“ Sequel ” as used in the decree meant nothing else but that the voyage was the succession of a series of shipments for the same unlawful purpose of supplying the troops of the belligerent enemy, the dictionaries including within the definition of the word “sequel” that this voyage was but the “ continuation ” of the previous practice in that regard.
The proof upon which the decree was predicated consisted of letters hidden on board the captured vessel. One of the owners, the Henry Anderson named in the record, was on board. Another owner gave instructions to the master to go to St. Bartholomew and sell that part of the cargo which was perishable and deliver all of it to Henry Anderson. These instructions were either fraudulent or Henry Anderson, the owner on board and the master, fraudulently violated the instructions of the home office. At the time of the capture the ship was to the leeward of Antigua. The majority opinion affirms the record fact that the vessel was making for Antigua and not St. Bartholomew. The protest of the master is silent as to the reasons assigned by the decree respecting the hidden papers, the false documentation, and the true destination. Neither master nor the owner on board, nor anyone else, denied the charge of the simulated purpose of the shipment in the face of the decree with which they were familiar when they made their protests and which decree recited the fact that the shipments were intended for the military use of the British Army. Thus, the privateer had proof that the cargo was being carried for a purpose, not to supply the foodstuffs to the civil population of Antigua, which may have been lawful, but to feed the enemy forces, which was certainly unlawful.
Antigua was an English island on which there were 10 forts, 2 batteries, .and numerous guardhouses. Before the *145 capture the military establishment, consisting of two regiments of infantry, two regiments of foot militia, with a squadron of dragoons and a battery of artillery, had been established on the island as a part of the armament of England. Edwards' History of West Indies, vol. 1, p. 484, 2d ed. English shipping rendezvoused around Antigua for the protection of this establishment and in furtherance of the hostile operations against the French in that part of the world. The white population was small, numbering only about 2,600, with nearly 40,000 slaves, besides a large number of native blacks free and persons of mixed blood. 1 Ed-wardssupra. The importance of the island grew out of its nearness to other islands under the dominion of England and other countries. The military establishment was necessary to prevent the uprisings of the black population as well as to operate when necessary against the contiguous group of islands in the neighborhood. In view of all these facts, it is unreasonable to indulge in the presumption that the foodstuffs were destined for anybody else but the British forces according to the language of the decree, as well as the surrounding circumstances which led to the decree.
The injection of the international-law rule into the discussion is irrelevant if the neutral was protected by a treaty. Both propositions must be noticed by me in their order.
It is universally conceded that, if a belligerent has reason for believing that a cargo is bound directly for the use of an enemy force the belligerent authority has the right to take the vessel of a neutral in for examination and trial before a prize court of the country to which the belligerent captor belongs; and to make a decree thereon arising out of the presumptions from the proven facts.
Destination for the enemy country and for use of conditional contraband for the people in general for articles conditionally contraband is lawful, but destination for the use of such articles by an enemy Government or its armed forces is not lawful.
Here the cargo in itself was relative contraband. Foodstuffs, classed as conditional contraband, may lawfully be shipped to territories of belligerents when, in fact, not *146 destined or intended as supplies for the belligerent Government or its armed forces. Shipments to enemy forces are by every stated rule in the law of nations declared to be unlawful. That rule was stated by Grotius, sometimes called the father of international law; decided by the greatest enun-ciator of admiralty law, Sir William Scott; passed on to Lord Salisbury; adopted by the Supreme Court of the United States; and in this day and time, while Europe is aflame with war, correctly stated by Sir Edward Grey and accepted by the American Government. According to Lord Salisbury the rule was and is that “ foodstuffs with a hostile destination can be considered contraband of war only if they are supplies for the enemy’s forces * * It must be shown that this was in fact their destination at the time of seizure. What else can we make out of an admitted decree to that effect than that the goods being shipped in this neutral were strictly for the use of the British Army. The decree so saying can not be whittled away by construction.
In Jonge Margaretha, 1 C. Rob., 189, Sir William Scott said that if the predominant character of the port to which the neutral was going was a port of naval military eguipment it shall be intended that the articles are going for military use, and notwithstanding merchant ships resort to the same place; although “ it is possible that the articles might have been applied to civil consumption.”
In the Edward, 4 C. Rob., 68, the same judge “ inferred ” an intention on the part of a Prussian ship in going into a French port, and said that inasmuch as no reason was assigned why the vessel should have been found where she. was described to be, but, on the contrary, where the ordinary rules of navigation required a different course the court was obliged to “ infer ” that the change of course was had without justifiable cause, and that the intention of getting into a port to which there was no documentation to supply an enemy was unlawful, though wines were not an article generally contraband per se. The French port named in that case was Brest, where there was notoriously an armament, and wines were to be considered articles of an indispensable nature. This case was founded upon the decision in the Jonge Margaretha, supra, and is sustained by the case of the *147 Franklin, 3 C. Rob., 217; Zelden Rust, 6 C. Bob.; and The Ranger, 6 Ibid., 125.
In The Commercen, 1 Wheat., 598, the Supreme Court said: “ If the neutral be guilty of fraudulent or unneutral conduct, by carrying articles destined for military use, that is, destined for the army or navy of the enemy, or for his ports of naval or military equipment, such articles are to be deemed contraband.” The court added that if such goods are destined for the direct or avowed use of the enemy army or navy the court would be glad to see an authority which countenanced this exemption from forfeiture, even though the property of a neutral. That case presented the question of the forfeiture of freight.
In Carrington v. Merchants’ Ins. Co., 7 Pet., 518, Mr. Justice Storv, in reviewing the cases, declared for the Supreme Court that “ the belligerent has a right to require a frank and bona fide" conduct on the part of neutrals in the course of their commerce in times of war, and if the latter will make use of fraud and use papers to elude the just rights of belligerents and cloak their own illegal purposes there is no injustice in applying to them the penalty of confiscation.” The court thought that the general features of the transaction must be taken into consideration in determining whether the neutral owner intended or did not intend by consenting to the transportation, to mix in the war.
Who could better judge of this than the French prize tribunal that condemned the neutral in the case at bar for taking enough part in the war between France and England to carry foodstuffs to the army on and the navy around the island, with .no opportunity on the part of the belligerent enemy to get supplies except from the agricultural population of Antigua or from neutrals willing to offend against the laws of nations ?
In the Peterhoff, 5 Wall., 59, the Supreme Court said that merchandise which may be and is used for purposes of war or peace was contraband “ when actually destined to the military or naval use of a belligerents That is this case.
These authorities uphold Lord Salisbury’s doctrine that foodstuffs may be held up “when destined to an enemy force,” because such a cargo was unlawful.
*148 Sir Edward Grey recently stated that foodstuffs should not be put into a prize court without presumption that they are intended for the armed forces of the enemy or their government. Our Government admitted this doctrine not only as to foodstuffs but as to other articles of common use known as relative contraband; that is, if destined for inhabitants generally, such conditional contraband should not be seized, but if designed for the enemy’s use or his armed forces seizure and detention became lawful.
Who now can doubt that the vessel named in this case was violating the laws of neutrality; that she was pretending to go to a neutral port whilst actually sailing to belligerent ports; that her hidden papers were intended to deceive; that she was aiding one of the belligerents to the injury of another? Who can doubt that she came within the rule declared by Dr. Taylor that her cargo was intended for military use and exclusively designed for military purposes? Taylor’s Int. Law, 737.
Antigua was in possession of an enemy force, and, according to the Supreme Court, the prize court rightly assumed that the cargo was intended to feed the forces of the enemy in possession, and therefore it was contraband “by destination.” The Prize Oases, 2 Black., 671, 672; Desty on Shipping, sec. 423; The Peterhoff, 5 Wall., 59. Destination is specially important, declared Chief Justice Chase in the Peterhoff, supra, and why should this court now “ assume ” something different from what the prize court had a right to assume and did assume in finding the purpose of the false documentation? English gold was expected for the contraband stuff; nothing was expected from a starving population.
The rights of commerce are important, but not more so than the rights of belligerents struggling for national existence. There will ever be a conflict on the one hand in the assertion of the absolute commercial right to buy and sell whatsoever may be offered for transport, and, on the other hand, the right of the belligerent to prevent the import and export of goods that commerce has chosen to barter for purposes of gain. No rule ever existed in the law of nations, or *149 under any treaty, which took from a belligerent the right to prevent the carriage of goods which enabled another warring Government to carry on its war.
The majority rely upon the right of this neutral to aid the English enemy of France by falling back upon Article NXIY of the treaty of 1778 between the United States and France, because, it is alleged, that article of the treaty allowed free shipment by either party to ports of belligerents of the other party of all merchandise not therein specified as contraband, only excepting such places as were blockaded or invested.
That treaty was not in actual force. It had become a dead letter. It was obsolete.
When the treaty was enacted the world was at peace. The treaty was entered into with no expectation on the part of our Government that the United States would be at war with anybody and might suffer from the acts of neutrals in the carrying trade. So when the treaty was executed France had no expectation of seeing neutrals from this country aiding her future English adversary by feeding that adversary’s forces.
From the time neutrals began to violate the laws of neutrality and the French began the seizure of our ships (some with great reason and some without reason, as the records of this court show) the treaty had no practical application. The aggressions may have been mutual, but it is certain that there was much in the French contention that privateers were put upon the high seas by the French to prevent the carrying of contraband, absolute or conditional, to the naval armaments and military establishments of Great Britain. The French contention was that the traffic was illegal and that cargoes carrying contraband ceased to be neutral goods, but became “ enemy’s property.” Ships and shipowners aided the British, and such neutral owners became pro hae vice the enemy, 3 Wash. C. C. R., 183. Our Supreme Court said in the Prize Gases that the word “ enemy ” was a technical phrase peculiar to prize courts and depending upon principles of public policy as distinguished from the common law.
*150 Generally speaking, goods carried under tbe flag of a country, whether that flag waves on land or sea, is entitled to the protection of the Government whose flag it is. When a merchantman of this country steams into a foreign port and unloads the cargo, the owner places it under the protection of the foreign power, and the obligation of our Government is to see that he receives the full measure of protection which the foreign Government accords to its own citizens. The obligation to protect can not be extended in cases where the flag has become unneutral.
France had the incontestable right to prevent shipments of conditional contraband, if being carried to aid her English enemy.
It was so at the time of this condemnation, and it is so now. The right of seizure and confiscation is being successfully asserted in the war now going on by the nation having the strongest sea power, and the same rule would obtain by the nations deficient in naval equipment could they overcome the present mastery of the sea. The Supreme Court of the United States declared the true rule in the case of the Bermuda, 3 Wall., 514. There it was said that neutral trade was entitled to protection in the courts; but neutrals in their own country might sell to belligerents whatever belligerents chose to buy. One of the exceptions to this rule, said the court, was that neutrals must not sell to one belligerent what they refuse to sell to the other; and another exception is that a neutral may convey in neutral ships from one neutral port to another any goods, whether contraband or not, “ if intended for actual delivery at the port of destination to become pari of the common stock of the country.” This authority excludes the right of a neutral to supply foodstuffs to a belligerent government or to its armed forces, just as in this case.
The act conferring jurisdiction upon this court, 23 Stat., 283, for the class of claims of which the case at bar is one, directed the court to determine the legality or the illegality of seizures and condemnations “ according to the rules of law, municipal and international, and the treaties of the United States applicable to the same.”
*151 There were two treaties between France and the United States February 7, 1778, one being the treaty of alliance and the other the treaty of amity and commerce, 8 Stat., 6. They were one. Gray's case, 21 C. Cls., 341. These were abrogated by act of Congress July 7,1798, 8 Stat., 6. The parties were not able to agree respecting these treaties, and the two Governments, acting together, finally agreed to abrogate their terms by the convention of September 30,1800, Art. II, 8 Stat. L., 178. Article XXIV, treaty of 1778, must be taken in conjunction with Article XXY of the same treaty and by the terms of the contemporaneous treaty of alliance.
Nothing in any of these treaties or in the convention can be applied to make a legal claim out of the seizure of the vessel and cargo in the case at bar, because—
(1) Passports were required. Ships laden with cargoes were to be provided with passports and with certificates to include the statement of true destination, so that it might be known whether any contraband goods were being carried for the use of an enemy belligerent. The master of this neutral substituted an untruthful passport and certificate for one not intended tó be used in the documentation to a neutral port when he was going to an enemy island. In the case of the Edward, 4 C. Rob., 68, Sir Wm. Scott held that the ordinary rules of navigation required a reason to be assigned by the captured ship for the change of course (which this ship never gave), and.on that decided that the court was under the necessity of “ inferring ” that the change of course was made without justifiable cause and with an intention. That in this case in the intention to do an unneutral act.
(2) President Washington proclaimed neutrality in 1793, and this proclamation remained in force until peace was concluded between England and France, in 1802, by the treaty of Amiens. 1 American St. Pap., Foreign Relations, 140; 1 Wait's Am. St. Pap., 44; Ex. Doc., No. 102, 19th Cong., 1st sess., 249. This proclamation materially aided in keeping this country out of actual war with France, despite the unneutral conduct of some of our citizens. The troubles of the period did result in what the Supreme Court declared in Bas v. Tingy, 4 Dall., 37, an imperfect war between France and *152 the United States. The proclamation had the force of law to the extent of withdrawing protection from those persons who carried goods, absolute contraband or conditional, to aid an enemy or his forces.
(3) Article XXIV of the treaty of 1778 is without application here because there was bad faith evidenced by hidden papers and by fraud of the kind mentioned in history. Around the time of this capture American skippers, as.neutrals, were free to go where they pleased. “ They fetched cargoes of every kind from every quarter of the globe; put in with them at American ports in order that they might there be reshipped, and took them thence to their destinations as neutral goods in neutral bottoms. The products of both Indies poured in at the ports of Holland, Spain, and France without let or hindrance- if only Yankee skippers brought them, and made their way by river and canal to the markets of every kingdom and principality ” whose resources Bonaparte was using to subdue the world. 3 Wilson’s History American People, 188. This author adds from history that those who fought the ruler named seemed defeated by neutral trade and by means of what seemed to them merely war disguised — “a veritable fraud of neutral flags by which the rules of war were annulled.”
The findings and decisions of this court show that frauds were perpetrated all along our seaboard in the carrying not only of contraband per se, but in the transportation of foodstuffs to sustain the English in the West Indies and elsewhere. England at the time mentioned had control of the sea and was the principal beneficiary in the violation by some of our people of the neutrality laws which Washington’s proclamation undertook to prevent.
(4) By the convention between the French Republic and the United States of September 30, 1800, supra, the United States conceded the correctness of the French demand. This demand of the French was predicated upon the charge that the United States had violated its treaty of alliance as well as its contemporaneous treaty of amity and commerce of 1778. The one involved the allegation that the United States had endeavored to evade the duty of protecting France in *153 case of war. Next, that the citizens of the United States had violated the laws of neutrality which the President’s proclamation had undertaken to stop. France denied the liability of its Government for the depredations of French privateers. Napoleon suggested the “equiponderating” character of the national claims of France and the individual claims of our American citizens. The adoption of the suggestion was an admission by the convention of 1800 that the one class of claims were of as much value as the other. When the Supreme Court came to deal with the act providing for the investigation of the spoliation claims that tribunal said that Congress, by the act of January 20, 1885, 23 Stat., 283, purposely brought the class of claims of which this is one within the category of payments by way of gratuity and of grace and not of right. This statement proves at least that our people were as much at fault in the violation of the treaty of 1778 as the French were at fault in depredating upon the commerce of our shippers and the seafaring people of the United States.
A complete answer to the question as to what are “ valid claims to indemnity upon the French Government ” under the spoliation act is found in the very comprehensive opinion of the Court of Claims speaking by Judge Davis (in review of Gray's case, 21 C. Cls.) in Cushing, Admr., v. United States, 22 C. Cls. R., 1. The court there decided that the question “ is to be measured by rules which relate to the rights and obligations of nations.”
In Hooper, Admr., v. United States, 22 C. Cls. R., 408, the court did not decide that a provision-laden ship bound to a British port to supply British enemy forces was legal undei the treaties of 1778. There is no decision which I have anywhere been able to find which holds any such doctrine.
Though this claim is ancient it may become the subject of an appropriation if it be found by Congress that the condemnation was illegal and that thereby the claim became valid. Our obligation is discharged when we report. A sense of duty constrains me to say that the claim is not valid unless we also admit that the neutral had the right to carry the supplies to a belligerent’s enemy forces; and unless we *154 also admit that President Washington was without power to issue this Government’s neutrality proclamation.
Note. — Extract from French decree of condemnation:
“ Qu’il est prouvé par les lettres trouvés caches a bord, addresses par les armateurs á Henry Anderson á Antigües les huit et dix-huit fevrier mil sept cent quatre-vingt-dix-sept que l’expédition du brick Sally pour St. Barthélmy est simulée, -que la veritable destination est pour la dite ile d’Antigues, que e’est une suitte d’envoyes d’approvisionne-ments pour l’armée anglaise, qu’il a été ainsi contrevenu au passe-port accordé pour la dite ile St. Barthélmy et en outre que le capitaine est irlandais naturalise seulement depuis dix mois.”